IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| JAMIE HUFFMAN, ADMINISTRATRIX AND PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM MICHAEL HUFFMAN, DECEASED,<br><br>    Plaintiff,<br><br>v.<br><br>FRED P. NEWMAN, ETC., ET AL.,<br><br>    Defendants. | Case No. 1:15CV00033<br><br>**OPINION AND ORDER**<br><br>By: James P. Jones<br>United States District Judge |

*Dennis E. Jones, Abingdon, Virginia, for Plaintiff; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendants.*

Following a fatal police shooting, the representative of the deceased's estate has sued the shooting officer and the sheriff, his employer, under 42 U.S.C. § 1983, claiming unconstitutional use of excessive force. She has also asserted a pendent state law wrongful death claim. The defendants have moved for summary judgment, invoking qualified immunity. For the reasons explained below, I will enter summary judgment on behalf of the defendants.

I.

The following undisputed facts are taken from the affidavits, party admissions, and other evidence submitted to the court as part of the summary judgment record.

On June 27, 2014, shortly before noon, plaintiff Jamie Huffman called 911 regarding her husband, William Michael Huffman, known as Michael. She told the operator that Michael had been drinking and had gone into the bathroom. She stated that she thought he had a gun and that a pistol was missing from the gun cabinet. Mrs. Huffman had heard a noise and was afraid to enter the bathroom. While speaking with the 911 operator over a landline, Mrs. Huffman used her mobile phone to call Sheila Cooke, who lived next door to the Huffmans. [1]

In response, Cooke came to the Huffman's house and went into the bathroom, and Mrs. Huffman followed. Michael sat on the toilet talking to Cooke, who was sitting across from him on the bathtub. Mrs. Huffman observed a shell casing on the floor of the bathroom, which she showed to Cooke. Michael stated that he had shot at a stray cat from the bathroom window. Mrs. Huffman described Michael as calm; he did not make any threatening statements or gestures.

Mrs. Huffman told the 911 operator that she still wanted an officer to respond to the residence because Michael had been making suicidal statements. Mrs. Huffman walked to the kitchen and remained on the phone with the 911

---

[1] The defendants submitted several exhibits that are inadmissible hearsay, including transcripts and recordings of two unsworn witness interviews conducted by police investigating the shooting. One of those interviews was of Cooke, who allegedly told the interviewer that the officers had warned Michael three or four times prior to Michael getting up from his chair and that Michael "could have made a motion in that direction [of the officers]" after he stood up. (Interview of Shelia Cooke 8, 11, ECF No. 32-1.) I do not consider that evidence in reaching my decision to grant summary judgment. The parties did not submit any deposition transcripts.

operator. She told the operator that her husband was experiencing withdrawal from pain medication. Cooke and Michael exited the bathroom and entered the living room, where Michael sat in a recliner chair. His pistol was next to him, resting between his right leg and the arm of the chair. Mrs. Huffman told the 911 operator where the gun was located.

Defendant Thomas Gregory Caldwell, a Deputy Sheriff of Washington County, Virginia, responding to the 911 call, then arrived at the Huffman home along with Virginia State Police Master Trooper Rick Fore. Deputy Caldwell asked Michael, still sitting in the recliner, if he had a firearm, to which Michael replied, "Huh." (Huffman Aff. ¶ 9, ECF No. 28-1.) Deputy Caldwell repeated the question, and Michael answered, "No." (*Id.*) Deputy Caldwell then asked Michael about the gun next to him and requested that Michael lay it down, but Michael responded, "No." (*Id.*) Deputy Caldwell ordered Michael to give him the gun at least two times, but Michael did not comply. Cooke told Michael that if he would give up his gun, she would get him a beer; he refused her request. Deputy Caldwell asked Michael, "[W]ould you like to tell me what's going on?" (*Id.*) Michael replied that he had been trying to shoot a stray cat out of his bathroom window. A beer bottle and prescription pill bottles were on a table next to Michael.

Deputy Caldwell motioned for Mrs. Huffman to step outside with him. Mrs. Huffman walked onto the porch and Deputy Caldwell stood in the front doorway. The recliner in which Michael was seated had its back to the front door, ten to twelve feet from the door. Mrs. Huffman told Deputy Caldwell that Michael had been depressed; had issues with prescription drugs and alcohol; and had gone into the bathroom and fired a gun, prompting her to call 911. Michael then rose from the recliner with the pistol in his right hand. Deputy Caldwell again ordered Michael to drop the gun. Michael did not do so, but instead began moving to his left. At that point, Deputy Caldwell fired one shot from his pistol, striking Michael.[2] Deputy Caldwell then secured Michael's firearm, handed it to Trooper Fore, and began administering first aid. Michael was transported by ambulance and helicopter to Bristol Regional Medical Center, where he died as a result of the gunshot wound.

The autopsy report revealed that the bullet fired by Deputy Caldwell entered Michael's body at the left side of the abdomen and traveled to the right side of the abdomen. The bullet's trajectory was "left to right, slightly downward and slightly front to back." (Mem. P. & A. Opp'n Defs.' Mot. Summ. J., Ex. 2, 1, ECF No. 28-4.) A photograph of Michael taken immediately after the shooting shows that the

---

[2] Mrs. Huffman recalls that after firing the shot, Deputy Caldwell said, "[D]rop it, or I will pop you again." (Huffman Aff. ¶ 14, ECF No. 28-1.)

gunshot wound was located on his left side, between his armpit and hip. (Reply to Pl.'s Resp., Ex. A, ECF No. 33-4.)

At no time prior to the shooting did Michael point his gun at anyone or make any verbal threats.[3]

Mrs. Huffman asserts a claim under 42 U.S.C. § 1983 of excessive force in violation of the Fourth Amendment, as well as a state law wrongful death claim pursuant to Va. Code Ann. § 8.01-50. She has named as defendants both Deputy Caldwell and Fred P. Newman, the Sheriff of Washington County.[4] The defendants have moved for summary judgment, arguing that they are entitled to qualified immunity and that the undisputed facts warrant judgment in their favor as a matter of law. Newman also contends that as a matter of law, he cannot be held liable for Michael's death under a theory of supervisory liability or negligent training. The motion has been briefed and orally argued and is ripe for decision. For the following reasons, I find that summary judgment is warranted.

---

[3] In a sworn statement filed in support of summary judgment, Deputy Caldwell indicated that immediately before he fired, Michael had turned the barrel of his gun toward him. State Trooper Fore's affidavit states that Michael was turning left toward the officers, "bringing the gun around," when Deputy Caldwell fired. (Fore Aff. Ex. C 1-2, ECF No. 23-1.) Although Mrs. Huffman was on the porch at the time of the shooting, she has sworn in her affidavit in opposition to summary judgment, that "[a]t no time did Michael point the firearm at anyone." (Huffman Aff. ¶ 19, ECF No. 28-1.) Because there is thus a dispute as to the gun's exact position and movement, for purposes of ruling on the summary judgment motion, I accept the version of facts most favorable to Mrs. Huffman, the nonmovant.

[4] Both defendants were named in their individual and official capacities, but I previously dismissed the official capacity claims. (Order, Aug. 31, 2015, ECF No. 15.)

-5-

Case 1:15-cv-00033-JPJ-PMS   Document 40   Filed 05/18/16   Page 5 of 13   Pageid#: 286

II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Id.* at 327. It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

A. Section 1983 Excessive Force Claim.

Deputy Caldwell contends that he is entitled to qualified immunity with respect to the plaintiff's § 1983 claim. Under federal law, police officers performing discretionary functions "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (internal quotation marks and citation omitted). Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.*

A court deciding the applicability of qualified immunity must determine "whether a constitutional violation occurred" and "whether the right violated was clearly established." *Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013); *see also Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). If I find that no constitutional right was violated, even when viewing the facts in the light most favorable to the plaintiff, my analysis ends, because the plaintiff cannot prevail as a matter of law. *See Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003).

Here, the plaintiff alleges that the defendants violated Michael's Fourth Amendment right to be free from unreasonable seizure. Specifically, the plaintiff alleges that Deputy Caldwell used excessive force when he shot Michael. The Fourth Amendment right to be free from unreasonable seizure encompasses seizures accomplished by excessive force. *Id.* at 527.

A claim that a law enforcement officer used excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness standard.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment's reasonableness test is objective. *Id.* at 397. "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). The court must determine whether the officer's actions were reasonable at the time of the incident, without the benefit of hindsight, and with the understanding that officers must often make split-second decisions in rapidly changing circumstances. *Id.*

When considering an excessive force claim, I "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotation marks and citation omitted). "Three factors guide us in this balancing: 1) the severity of the crime at issue; 2)

the extent to which the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Lee v. Bevington*, No. 15-1384, 2016 WL 2587380, at *6 (4th Cir. May 5, 2016) (unpublished). In this case, Michael was not suspected of committing a crime and was not attempting to evade arrest at the time of the shooting, so only the second factor applies. While "[t]he intrusiveness of a seizure by means of deadly force is unmatched," an officer is constitutionally permitted to use deadly force when there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 9, 11 (1985).

The Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson*, 247 F.3d at 131. Indeed, "an officer is not required to see an object in the suspect's hand before using deadly force." *Id.* The Fourth Circuit has noted that "[w]hen a suspect confronts an officer with a weapon, we have deemed the officer's use of deadly force reasonable." *Ayala v. Wolfe*, 546 F. App'x 197, 200 (4th Cir. 2013) (unpublished).

Applying these standards, I find that Deputy Caldwell's use of deadly force was objectively reasonable because the totality of the circumstances known to Caldwell at the time of the shooting would lead a reasonable officer to believe that

Michael posed an imminent threat of serious physical harm to Deputy Caldwell or others. Deputy Caldwell had been called to the residence because Michael had been making suicidal statements in recent days, had been drinking that morning, and had just fired a gun in the residence. Michael was in possession of a firearm that he refused to relinquish despite repeated requests and commands from Deputy Caldwell and others. Immediately before the shooting, Michael stood up from his chair with the gun in his hand, a short distance away from the officer. Under those circumstances, a reasonable police officer would have perceived an imminent threat. Deputy Caldwell was not required to wait until the gun was pointed at him. "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Elliott v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996). For these reasons, I find that Deputy Caldwell is entitled to qualified immunity.

    The plaintiff argues that Michael had a right to lawfully possess a firearm in his own home. While that may be true, he did not have a right to brandish the firearm in front of law enforcement officers after repeatedly being told to drop it. The plaintiff also contends that factual disputes preclude the entry of summary judgment because the witnesses differ as to where Michael's gun was pointed, where he was going, and whether he had turned toward Deputy Caldwell at the

time Caldwell fired his weapon.[5]  But the mere existence of factual disputes does not prevent a party from prevailing on an otherwise properly supported motion for summary judgment.  *See Anderson*, 477 U.S. at 247-48.  Rather, the moving party only needs to show that there are no *genuine* issues of *material* fact for trial.  *Id.*  Here, Deputy Caldwell is entitled to qualified immunity based on the undisputed facts, regardless of the factual disputes described.  Because the facts contained in the record do not make out a constitutional violation, Deputy Caldwell is entitled to summary judgment on the Fourth Amendment claim asserted by the plaintiff under § 1983.

The plaintiff's claim against Sheriff Newman fails for the same reason; no violation of Michael's Fourth Amendment rights occurred, so Sheriff Newman cannot be held liable for any failure to adequately train or supervise Deputy Caldwell.  *See Anderson v. Caldwell Cty. Sheriff's Office*, 524 F. App'x 854, 862 (4th Cir. 2013) (unpublished) (explaining that "[n]o actionable claim against supervisors or local governments can exist without a constitutional violation

---

[5]  In the brief in opposition to summary judgment, Mrs. Huffman's attorney states that when Michael "beg[a]n to rise" from his chair, Deputy Caldwell said "drop it" and "immediately" shot Michael "in the back."  (Mem. P. & A. Opp'n Defs.' Mot. Summ. J. 3, ECF No. 28.)  Mrs. Huffman's affidavit does not support those contentions.  While she did state that Michael had been "shot in the back" (Huffman Aff. ¶ 15, ECF No. 28-1), the plaintiff's own evidence shows to the contrary.  More importantly, her sworn statement does not claim that Deputy Caldwell shot Michael "immediately" after he rose from his chair and was warned by the officer.  Her actual statement is that "[w]hile I was talking to Officer Caldwell, Officer Caldwell said 'drop it' and fired his gun."  (*Id.* at ¶ 14.)  She does not dispute the numerous prior warnings made to Michael before the shooting as related by both Deputy Caldwell and Trooper Fore.

-11-

committed by an employee"). Moreover, there is no vicarious liability under § 1983. Supervisory officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). The plaintiff attempts to bring her claim within the "official policy" theory of liability articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 694-95 (1978), by alleging that "the excessive force to which [Michael] was subject[ed] was an institutionalized practice of the Washington County Sheriff's Office." (Compl. ¶ 32, ECF No. 1.) However, the plaintiff has failed to produce any evidence in support of that bald assertion. Like Deputy Caldwell, Sheriff Newman is entitled to summary judgment on the plaintiff's § 1983 claim.

### B. State Law Wrongful Death Claim.

The plaintiff also asserts a claim against the defendants under the Virginia Death by Wrongful Act statute, Va. Code Ann. § 8.01-50. This court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

To prevail under the Death by Wrongful Act statute, a plaintiff must establish that the decedent's death was caused by a "wrongful act, neglect, or default." Va. Code Ann. § 8.01-50(A). Under Virginia law, "[a] wrongful act imports lack of justification or excuse." *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994) (citing *Pike v. Eubank*, 90 S.E.2d 821, 827 (Va. 1956)). In

this case, as explained above, the undisputed facts demonstrate that the shooting was justified.

The plaintiff admits that before shooting, Deputy Caldwell repeatedly told Michael to drop his weapon. It is undisputed that Deputy Caldwell did not fire until Michael rose up with the gun in his hand. As stated above, Deputy Caldwell acted reasonably under the circumstances, and as a matter of law, his actions do not amount to an actionable tort. Therefore, the defendants are entitled to prevail as to the plaintiff's wrongful death claim, and I will grant summary judgment in their favor on that count.

IV.

This is a tragic case. I fully understand Mrs. Huffman's anguish over what she considers her husband's unnecessary loss of life. I am also certain that Deputy Caldwell deeply regrets that he found it necessary to take someone's life. Nevertheless, I find that Deputy Caldwell acted reasonably and with justification, and cannot be held legally liable for Michael's death. For the foregoing reasons, it is **ORDERED** that defendants' Motion for Summary Judgment (ECF No. 18) is GRANTED. A separate final judgment will be entered forthwith.

ENTER: May 18, 2016

/s/ James P. Jones
United States District Judge

-13-

Case 1:15-cv-00033-JPJ-PMS   Document 40   Filed 05/18/16   Page 13 of 13   Pageid#: 294